# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ANDRE HATCHETT,

      Plaintiff,

v.

THE CITY OF NEW YORK, NEW YORK, a
municipal entity; DETECTIVE RICHARD
FERGERSON, in his individual capacity;
DETECTIVE VICTOR RICE, in his individual
capacity; DETECTIVE ROBERT DONAWA,
in his individual capacity; DETECTIVE
LLOYD HENRY, in his individual capacity;
DETECTIVE DERRICK J. PARKER, in his
individual capacity; OFFICER MICHAEL
ZANATTA, in his individual capacity;
OFFICER ERIC HARSCH, in his individual
capacity; and OTHER AS-YET-UNKNOWN
JOHN AND JANE DOE OFFICERS &
SUPERVISORS 1-10, in their individual
capacities,

      Defendants.

**Case No. 17-cv-1324**

**COMPLAINT AND JURY DEMAND**

Plaintiff Andre Hatchett, by and through his attorneys, the law firm Neufeld Scheck &

Brustin, LLP, alleges as follows:

## INTRODUCTION

1.     Plaintiff Andre Hatchett spent nearly twenty-five years in jail and prison for a crime he

did not commit.

2.     At approximately 11:00 PM on February 18, 1991, the naked body of a thirty-seven-year-

old woman, later identified as Neda Mae Carter, was found in a dimly-lit park in Brooklyn. An

unknown assailant had strangled and severely beaten her multiple times with a heavy, blunt

1

instrument, exposing her skull, knocking her teeth out, crushing her larynx and tearing her uterus, and he dragged her body across the ground.

3.      Mr. Hatchett is completely innocent of the murder of Ms. Carter and has no knowledge of the true perpetrator.

4.      At the time of the crime, Mr. Hatchett was a twenty-four year old man with learning disabilities and cognitive limitations and was extremely disabled due to gunshot injuries to his leg and throat sustained the year before. Mr. Hatchett had multiple fractures in the bones in his right leg, necessitating fixation pins and bone grafts, and leaving him unable to walk at the time of the crime without a cast or crutches. Because of his injuries, Mr. Hatchett lacked sufficient mobility and strength to wield a heavy object with force or drag an adult human body on the ground, as the unknown perpetrator who attacked Ms. Carter had done.

5.      Despite his innocence, Mr. Hatchett was wrongfully arrested, prosecuted, and convicted of killing Ms. Carter.

6.      Mr. Hatchett's wrongful conviction was no accident. Rather, it was the result of misconduct by Defendant NYPD Detectives and Officers, who used unduly suggestive identification procedures and other improper tactics to cause two unreliable purported witnesses to falsely identify Andre Hatchett as Ms. Carter's assailant. The Defendants fed those individuals facts they believed to be true about the crime, and about Mr. Hatchett, to make the accounts appear reliable and corroborate one another. The Defendants then misrepresented orally and in writing that the facts they had fed independently originated with each purported witness, rather than with the police.

7.      The NYPD Detectives' misconduct in securing these false and tainted witness statements and identifications caused Mr. Hatchett to be arrested and convicted of Neda Mae Carter's homicide. He was sentenced to a term of imprisonment of twenty-five years to life in prison.

8.      These two false identifications and witness statements were the only evidence connecting Mr. Hatchett to Ms. Carter's murder. No physical or other evidence linked him to the crime in any way.

9.      Mr. Hatchett consistently and adamantly maintained his innocence to the murder, despite his cognitive limitations and repeated pressure by the Defendant Detectives to make an admission.

10.     But for Defendants' misconduct, Mr. Hatchett would not have been convicted of a crime that he did not commit, and Neda Mae Carter's true killer might have been found.

11.     The misconduct and unlawful tactics used by these Detectives to secure Mr. Hatchett's conviction was not an isolated occurrence, but was common within the NYPD at the time. These tactics included, but were not limited to: repeated use of clearly incredible informants/witnesses; using suggestion and/or coercion to induce informants/witnesses to create fabricated accounts of a crime and to falsely identify suspects; feeding witnesses and informants facts to bolster their accounts; misrepresenting that facts fed to an informant/witness by the officer had instead originated with the informant; and the suppression of favorable and impeaching evidence.

12.     Mr. Hatchett's wrongful conviction was finally reversed in 2016, when he was exonerated following a reinvestigation by the Conviction Review Unit (CRU) of the Kings County District Attorney's Office (KCDA).  The KCDA concluded that Mr. Hatchett's case was a "wrongful conviction" and explained to the Court that "[i]t is implausible to the point of saying impossible for a person with Mr. Hatchett's physical limitations to have been able to commit all

3

of these acts which the perpetrator must have committed." The KCDA filed a joint motion with Mr. Hatchett's post-conviction counsel at the Innocence Project to vacate the conviction and exonerate Mr. Hatchett, which was granted the same day it was heard.

13. In March 2016, Mr. Hatchett was finally released from prison after serving nearly 25 years for a crime he did not commit.

14. Through this civil rights action, Mr. Hatchett seeks to bring the Defendants' misconduct to light and to ensure they are held accountable for their actions. Mr. Hatchett also seeks justice for the youth and nearly 25 years that he lost as a result of his unjust conviction.

## JURISDICTION AND VENUE

15. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Andre Hatchett's rights as secured by the United States Constitution.

16. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17. Supplemental jurisdiction over Mr. Hatchett's state law claims exists pursuant to 28 U.S.C. § 1367(a).

18. Mr. Hatchett has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Corporation Counsel of the City of New York on June 3, 2016. The notice was served within the time required by the New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

19. At the request of the City of New York, Mr. Hatchett submitted to a hearing pursuant to New York General Municipal Law Section 50-h on October 7, 2016.

20. Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(b), in that this is the District in which the claim arose.

**JURY DEMAND**

21.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

**PARTIES**

22.     Plaintiff Andre Hatchett is a citizen of the United States and is currently a resident of the State of Pennsylvania. At all times relevant to this Complaint he was a citizen and resident of Brooklyn and the State of New York.

23.     Defendant City of New York was and is a municipality that is a political subdivision of the State of New York, was the employer of the individual Defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD").

24.     Defendant Detective Richard Fergerson was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

25.     Defendant Detective Victor Rice was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to

indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

26.     Defendant Detective Robert Donawa was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

27.     Defendant Detective Derrick J. Parker was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

28.     Defendant Detective Lloyd A. Henry was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

29.     Defendant Police Officer Michael Zanatta was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

30.     Defendant Police Officer Eric Harsch was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

31.     Defendant Does #1 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors, and/or other agents and employees of the NYPD, acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual capacities.

# FACTS[1]

## NEDA MAE CARTER'S HOMICIDE

32.     At approximately 11:00 PM on February 18, 1991, the body of a thirty-seven-year-old woman, later identified as Neda Mae Carter, was found naked and severely beaten in a dimly-lit park in Brooklyn. That evening it had been raining.

33.     The crime against Ms. Carter was heinous and committed by an unknown perpetrator of considerable strength. Ms. Carter had been strangled by ligature and her larynx was crushed; she was severely beaten multiple times with a blunt instrument which knocked several teeth out of her gums and left her skull exposed; her injuries had been caused by a heavy object, and metal pipes were found near the body; her vulva was penetrated with an instrument that tore her uterus apart; and her body had been dragged across the ground.

34.     Andre Hatchett did not kill Neda Mae Carter and had no involvement in that horrific crime or knowledge of the true perpetrator.

35.     Given Mr. Hatchett's physical injuries sustained the year before as the result of gunshot wounds that shattered the bones in his leg and left him unable to walk without the assistance of a cast or crutches, Mr. Hatchett was not physically capable of committing the crime against Ms. Carter.

36.     Specifically, on July 11, 1990, Mr. Hatchett was shot several times in the neck and leg. He was taken to the hospital where he entered surgery to treat his wounds, and was given an emergency tracheotomy and a tube was placed in his chest. Mr. Hatchett's fracture in his leg

---

[1] Andre Hatchett did not kill Neda Mae Carter, and he has no personal knowledge of or involvement in this horrific crime. All the descriptions in this Complaint concerning the circumstances of the crime, as well as portions of the investigation for which Mr. Hatchett was not personally present, are based upon trial and hearing testimony, police reports, and independent investigation.

required two bone grafts, metal pins, and a leg cast. Bones from his hip were removed to be used for the bone graft. He was not discharged from the hospital until September 27, 1990, but was then re-hospitalized in October after he fell down a flight of stairs and re-injured his leg. X-rays taken at that point showed that his leg had not yet healed. X-rays taken on January 17 showed that the leg had still not healed, and Mr. Hatchett was suffering from poor circulation. On February 1, 1991, just a few weeks before Ms. Carter's murder, doctors noted that a scan of Mr. Hatchett's leg showed the bones had still not fully healed, and he was told to continue using crutches and return in six weeks for a follow up appointment.

### INVESTIGATORS CANVASS FOR LEADS AND ARE UNABLE TO FIND TRUE PERPETRATOR

37.     The night of the homicide, Defendant Police Officer Michael Zanatta was the first officer who arrived to the scene. Defendant Detective Richard Fergerson of the 81st Precinct subsequently became the lead detective assigned to Ms. Carter's case. He was assisted in the investigation by his partner, Detective Victor Rice, along with Detectives Robert Donawa, Derrick Parker, and Lloyd Henry, and Officers Zanatta and Harsch.

38.     As soon as the victim was discovered, officers began canvassing the neighborhood and adjacent apartment buildings for information, but the search did not lead to any possible suspects.

39.     The next day, Defendants, including Detective Fergerson, spoke with the victim's mother, who shared a room with the victim in a boarding house in Brooklyn. Among other things, she informed Detective Fergerson that Mr. Hatchett had been at their house the day of the murder, and spent time there with her and her daughter. Mr. Hatchett's aunt lived in another bedroom in the same rooming house.

40.     The next morning, around 9:00 AM on February 20, 1991, Mr. Hatchett voluntarily

responded to Detective Fergerson's request for him to come to the 81st Precinct for an interview.

41.     During an interview with Defendants, including Detectives Fergerson and Rice, Mr. Hatchett confirmed that he had visited the house where his aunt and the victim lived on February 18, 1991. He truthfully explained that while at the house, the victim asked Mr. Hatchett to borrow money to purchase crack cocaine on two separate occasions. In each instance, Mr. Hatchett loaned her the money and the victim departed the house with her friend Penny to purchase drugs. When the victim failed to return from her second outing, Mr. Hatchett left.

42.     Mr. Hatchett also gave police a truthful, verifiable alibi in addition to detailing all of his actions earlier that day: at the time of the murder, he was socializing with his friend, Tyrone Thomas, and Tyrone's girlfriend, Tanya, at Tanya's residence, after which Mr. Hatchett went home.

43.     Due to his cognitive limitations (Mr. Hatchett's IQ was repeatedly tested and reported to be in the range of 58 to 66, and he was described to have mild retardation and borderline intelligence), Mr. Hatchett could not have reported such a detailed explanation of his whereabouts on the day Ms. Carter was killed if it were false.

44.     The medical examiner's report confirmed that Neda Mae Carter had cocaine in her system at the time of her death.

45.     Defendants, including Detectives Fergerson and Rice, released Mr. Hatchett after the interview as there was no evidence implicating him in the murder.

### DEFENDANTS USE MISCONDUCT TO BUILD CASE
### AGAINST ANDRE HATCHETT

46.     A full week passed after Ms. Carter's murder without any leads bringing Defendants closer to solving the homicide.

47.     Then, on or about February 25, 1991, longtime criminal Jerry Williams was arrested and

confined at the 81st precinct on a burglary charge.

48.     Mr. Williams's rap sheet included approximately 28 prior arrests and 20 prior convictions for numerous crimes, including sexual abuse, assaulting a woman, drug sales, and numerous other burglaries.

49.     Defendant Zanatta, the first officer who had arrived at the scene of Ms. Carter's murder, was present at the 81st precinct when Williams was brought to custody by Defendant Harsch.

50.     Williams identified another person who was in lockup with him as the perpetrator of Ms. Carter's murder to Zanatta and Harsch: a man named James Pringle. Defendants Fergerson, Donawa, and Rice, along with Defendants Parker and Henry, were subsequently informed of this and spoke with Williams.

51.     For at least the next 24 hours after Jerry Williams identified James Pringle, Defendants believed James Pringle to be the main suspect in Ms. Carter's homicide and thoroughly investigated him. Through that investigation, Defendants discovered that James Pringle had been incarcerated at the time of the murder and thus could not have committed the crime.

52.     Upon learning that Williams's identification of Pringle could not have been correct, rather than dismissing Jerry Williams as a clearly unreliable reporter, Defendants Fergerson, Rice, Donawa, Parker and Henry, saw an opportunity to use Williams to close the case. Lacking any other leads, Defendants used improper tactics to induce Jerry Williams to identify Andre Hatchett (who they knew had been with the victim earlier on the same day as her murder) instead.

53.     Defendants, including Defendants Fergerson and Donawa, arranged for Williams to view a live lineup with Andre Hatchett, despite the fact that Williams had identified another individual, James Pringle, as the murderer less than 24 hours earlier.

54.     Prior to the lineup, Defendants, including Detective Fergerson, showed Mr. Williams mugshot photos of Mr. Hatchett to familiarize him with Mr. Hatchett's appearance such that he would be able to make a positive ID. Defendants never documented or otherwise disclosed this improper photo showing to prosecutors or Mr. Hatchett.

55.     Defendant Parker, Rice, and other Detectives arrested Mr. Hatchett and brought him to the lineup, which was conducted by Defendants Fergerson and Donawa. Defendants failed to provide Mr. Hatchett with any Miranda warnings.

56.     After the lineup, Defendants including Detectives Fergerson and Donawa, reported to prosecutors that Williams had identified Mr. Hatchett, and Mr. Hatchett was arrested and placed in jail.

57.     Williams's "identification" of Mr. Hatchett at the lineup was not the result of a fair identification procedure, but was the product of unconstitutional suggestion by Detectives including Defendants Fergerson and Donawa. That suggestion included showing Mr. Williams a mugshot photo of Mr. Hatchett prior to the lineup and other suggestive tactics used at the lineup itself.

58.     Defendants Fergerson and Donawa later reported in written reports and oral conversations with prosecutors that, during their interviews with Williams, Williams independently volunteered the following facts, which were consistent with the way police believed the crime had occurred: Williams and a woman were walking in the park where Ms. Carter's body was found and heard a scream. From about 30 to 40 feet away, they saw a man standing over a woman, and the man was swinging at the body below with an instrument that could have been a pipe.

59.     Defendants also reported that Williams told them he could not recognize the victim, but

that he recognized the man as someone he had seen thirty or forty times before at soup kitchens in the area over the last 1.5 years. Defendants reported that Williams described the man as about 5'6" with a full beard, thin moustache and a harsh, distinctive voice, and that Williams knew the man had been shot in the foot or leg sometime the year before and walked with crutches.

60.     Mr. Hatchett was in fact about 5'6" and had a full beard and thin moustache. And he had in fact been shot in the leg the prior year and had been using crutches to walk; during the same incident he had also been shot in the neck and had a tracheotomy, which left him with a distinctive, raspy voice. Defendants were aware of all of these facts prior to meeting with Jerry Williams, from their earlier investigation and interview of Mr. Hatchett.

61.     Mr. Hatchett had never encountered Jerry Williams, and did not eat meals in soup kitchens; he ate at his mother's house or his girlfriend's house.

62.     Nor did Jerry Williams witness Andre Hatchett committing the murder; Andre Hatchett is innocent. Upon information and belief, Jerry Williams did not witness the murder at all, nor did he volunteer any of the facts to Defendants as Defendants reported; to the contrary, Defendants, including lead Detective Fergerson, fed Williams facts about the crime that Defendants believed to be true—including that the victim had been beaten with an instrument believed to be a pipe, and information about Mr. Hatchett's appearance and the fact that he had been shot the year before, was using crutches, and had a raspy voice—and Williams agreed to repeat those facts in exchange for explicit or implicit promises of leniency on his pending charge and/or other favors.

63.     Defendants Fergerson, Rice, Donawa, Parker, and Henry did not disclose to any prosecutor or counsel for Mr. Hatchett that Defendants had fed the facts in Jerry Williams's statements to Jerry Williams. Instead, Defendants misrepresented orally and in written reports that the facts in Williams's statements had independently and voluntarily originated with

Williams.

64.     Furthermore, although Defendants Fergerson and Donawa reported to prosecutors that Williams had identified Hatchett at the lineup, they did not document or disclose to prosecutors any of their misconduct preceding the lineup, including showing Williams photographs of mugshots of Mr. Hatchett, or document or disclose any suggestion used during the lineup. Contrary to NYPD policies and procedures, Defendants Fergerson and Donawa failed to document the lineup in a police report at all, as required.

65.     Ultimately, Williams's burglary charges were dismissed and he was not prosecuted. Upon information and belief, this was in exchange for his cooperation with Defendants in the investigation of Ms. Carter's murder.

### AFTER THE KCDA REFUSES TO PROSECUTE ANDRE HATCHETT GIVEN UNRELIABILITY OF WILLIAMS, DEFENDANTS USE MISCONDUCT TO SECURE A SECOND PERSON TO BOLSTER WILLIAMS'S FALSE ACCOUNT

66.     Although Defendants had secured an identification of Andre Hatchett by Jerry Williams, and a statement from Williams that contained facts pointing to Andre Hatchett—and did not disclose any of the misconduct that generated that falsely incriminatory evidence—Jerry Williams's identification was still so clearly unreliable that the King's County District Attorney's Office declined to prosecute Mr. Hatchett on that basis alone.

67.     Prosecutors learned of Williams's prior identification of James Pringle, and also learned that the night of the murder, Williams was high on crack cocaine. Apparently recognizing the problematic nature of Mr. Williams's identification of Mr. Hatchett—including his earlier identification of another person, his use of crack cocaine, and the lack of other evidence implicating Mr. Hatchett—prosecutors told Defendant Fergerson that if another witness or additional evidence was not found, the case would be "343'ed", or dismissed without

arraignment. Mr. Hatchett was then released.

68.     In order to build a case against Mr. Hatchett, Defendants started searching for another witness to corroborate Mr. Williams's taped statement given to police and prosecutors, and statements he purportedly made documented by Detectives in their reports. Defendants, including Defendant Fergerson, Rice, and Donawa, began searching for a woman who used crack that Mr. Williams had identified in his taped statement as "Pi-Pi," and learned from various individuals about a woman in the neighborhood named Popeye who was known as a "crack head" and would likely be located in a crack house.

69.     Defendants, including Defendants Fergerson, Rice, Parker, and Donawa, also re-interviewed Mr. Hatchett repeatedly. Mr. Hatchett, who, in addition to his physical injuries is and was cognitively impaired, truthfully, adamantly and unwaveringly insisted on each occasion he was interviewed that he had nothing to do with and no knowledge of the crime, and explained repeatedly to officers, in as much detail as he could recall, what he was doing the day and evening of Ms. Carter's murder including identifying the people with whom he spent the evening.

70.     On March 16, 1991, Defendants Fergerson and Donawa located and interviewed a crack user named Yvette Hopkins, who also purportedly used the nickname "Popeye." During an interview with Ms. Hopkins on March 16, 1991 at the 81st precinct, Ms. Hopkins stated she did not know Jerry Williams and had no knowledge about a homicide.

71.     The following day, Defendant Fergerson re-interviewed Ms. Hopkins. She reiterated that she had not been in the park with Jerry Williams on the night of February 18, 1991, and "did not know what [the detectives] were talking about."

72.     However, when Defendant Fergerson interviewed Ms. Hopkins a third time, her story

changed to conform with the statements provided by Jerry Williams: that she and Williams were walking through the park when they saw a man beating a girl lying on the ground, and the man told them to mind their business.

73.     Upon information and belief, Detective Fergerson fed Ms. Hopkins those details so that her statement would be consistent with Williams's, and then used coercion, promises, other inducements, and/or threats to convince Ms. Hopkins to repeat the false statement in order to corroborate Williams as a witness.

74.     Upon information and belief, Defendant Fergerson's partner, Defendant Rice, was also present for all of Defendant Fergerson's interviews of Yvette Hopkins.

75.     Ms. Hopkins then gave a statement to prosecutors which was audio recorded and conducted in the presence of Detective Fergerson, in which she repeated details that had been fed to her by Detective Fergerson.

76.     Defendant Fergerson did not disclose to any of the prosecutors present for Ms. Hopkins's taped statement, nor did they disclose to any other prosecutor or counsel for Mr. Hatchett, that Defendants had fed the facts in Ms. Hopkins's statement to her. Instead, Defendants misrepresented orally and in written reports that the facts in Ms. Hopkins's statement had independently and voluntarily originated with Ms. Hopkins.

77.     Over a week later, on March 26, 1991, Defendants Fergerson and Parker, along with other Detectives, went to Mr. Hatchett's residence and instructed him to come to the station again for a lineup.  Mr. Hatchett's request for a lawyer went unheeded.  Defendants also failed to provide Mr. Hatchett with any Miranda warnings.

78.     During the lineup, which was conducted by Defendants Fergerson and Donawa on March 26, 1991 at approximately 9 PM, Ms. Hopkins viewed Mr. Hatchett in a room with five other

men.  When asked whether she could identify the perpetrator, she identified someone other than Mr. Hatchett.

79.      Despite Ms. Hopkins's identification of another individual, the lineup did not end. Instead, Detective Fergerson brought each of the lineup participants closer to the observation window and asked Ms. Hopkins to make another identification.  It was only on this second attempt that Defendants obtained the identification they sought: Andre Hatchett.

80.      Ms. Hopkins did not witness Andre Hatchett committing the murder of Ms. Carter because Mr. Hatchett is innocent of that crime. Upon information and belief, Ms. Hopkins did not witness the murder at all.

81.      Defendants Fergerson and Donawa did not disclose to prosecutors or Mr. Hatchett any of the improper suggestion they used to obtain Ms. Hopkins's identification of Mr. Hatchett.

82.      Upon information and belief, Defendant Rice, Defendant Fergerson's partner, was also present for the lineup conducted by Fergerson and Donawa and was aware of the suggestion used to obtain Ms. Hopkins's identification of Mr. Hatchett.

83.      At that point, at approximately 9:05 PM on March 26, 1991, Mr. Hatchett was arrested. Mr. Hatchett would remain incarcerated for the next nearly twenty-five years.

84.      In addition to suppressing the misconduct and suggestion they used to secure Williams and Hopkins's identifications of Mr. Hatchett, Defendants Fergerson, Rice, Donawa, Parker, Henry, and Officers Zanatta and Harsch, intentionally ignored other indications of Mr. Hatchett's innocence and failed to take basic investigative steps that would have revealed Mr. Hatchett's innocence.

85.      Defendants never attempted to speak with any of the individuals Mr. Hatchett identified who could corroborate his whereabouts on the night of the murder.  In addition, the Defendants

never inquired whether a man with Mr. Hatchett's physical impairments could have committed such a powerful crime, or, in the alternative, they were aware that Mr. Hatchett's physical impairments prevented him from committing the crime but chose to ignore that fact.

86.     Defendants also maintained that Jerry Williams's and Yvette Hopkins's statements were true and correct, and misrepresented to prosecutors that they independently originated with both of these purported witnesses, notwithstanding the fact that Defendants had fed facts about the crime and Mr. Hatchett to them. Defendants also suppressed the fact that they had conducted overly suggestive ID procedures.

87.     Although there was other evidence known to prosecutors and Mr. Hatchett that indicated Williams and Hopkins were generally unreliable, Defendants' misrepresentations to prosecutors that Williams and Hopkins had each independently reported facts that matched the crime and Mr. Hatchett made Williams and Hopkins falsely appear to be credible in this specific case.

88.     Defendants furthermore failed to investigate serious inconsistencies between the purported witnesses' accounts and the evidence. For example, although Ms. Hopkins's statement indicated that she was with both Mr. Williams and a person named Tiny, Defendants never attempted to locate or speak with Tiny to verify Ms. Hopkins's version of events because they knew it was not true. And, there was no physical evidence connecting Mr. Hatchett to the crime scene in any respect.

89.     Upon information and belief, if the Defendants had conducted a minimally adequate investigation by speaking with Mr. Hatchett's alibi witnesses, investigating the inconsistent statements provided by Williams and Hopkins, sought out the other acquaintances Neda Mae Carter saw in the hours before her murder, or investigated Mr. Hatchett's disabilities, they would have discovered that Mr. Hatchett did not, and could not, have committed the crime.

90.    Despite the absence of any physical evidence to corroborate Jerry Williams and Yvette

Hopkins's false accounts of the crime and the fact that each had identified other individuals prior

to identifying Mr. Hatchett, the prosecution moved forward with the case against Mr. Hatchett on

the basis of the Defendants' misrepresentations and fabrications, and Defendants' failure to

disclose the misconduct that secured both identifications of Mr. Hatchett.

91.    Throughout the investigation, grand jury proceedings, pretrial hearings, and trial,

Defendants actively misrepresented that Mr. Hatchett had been identified as the perpetrator by

two reliable eyewitnesses without pressure or influence by the police, when in fact those

identifications were obtained using improper suggestion.

92.    Upon information and belief, all officers assisting and involved in the investigation were

aware of the misconduct of the other officers in the investigation, and were aware of their duty to

report such misconduct, but did not.

93.    Upon information and belief, NYPD Supervisors, including Does #1 and #2, played an

active role in the investigation of the Carter homicide, including signing off on reports

containing falsehoods and misrepresentations. Upon information and belief, these supervisors

were aware of the misconduct of the other officers in the investigation, and aware of their duty to

intervene, but did not.

## PROSECUTION AND WRONGFUL CONVICTION

94.    On April 12, 1991, Mr. Hatchett was indicted on two counts of murder in the second

degree. He was arraigned on these charges and pleaded not guilty.

95.    At the pretrial *Wade* hearing held on October 18, 1991, Mr. Hatchett moved to suppress

the identifications of him by Mr. Williams and Ms. Hopkins.  During the hearing, consistent with

his prior misrepresentations, Detective Fergerson falsely testified that both lineups were

conducted according to standard procedure, and did not disclose the suggestion used to obtain

the identifications, including showing a mugshot photo of Andre Hatchett to Jerry Williams prior

to the lineup, or the fact that Williams had identified another person entirely before the lineup.

Detective Fergerson also falsely testified that Ms. Hopkins initially stated she was unsure

whether the perpetrator was in the lineup, rather than initially identifying someone other than Mr.

Hatchett.  In the absence of information about Defendants' misconduct or any information that

Fergerson's testimony was false, Justice Barasch denied the motions to suppress.

96.     Mr. Hatchett was tried before a jury. The trial lasted from October 21, 1991, through

October 25, 1991.

97.     At trial, the only evidence implicating Mr. Hatchett in the crime was testimony from

Jerry Williams. Either because Ms. Hopkins refused to testify, or because the prosecution

deemed her testimony unhelpful or too unreliable, she was not called to testify. Although

prosecutors had previously deemed Mr. Williams's identification too unreliable to prosecute Mr.

Hatchett without additional eyewitness testimony, the trial nonetheless proceeded solely on the

basis of Mr. Williams's testimony.

98.     Even leaving aside his prior identification of another man, Mr. Williams's account was

obviously unreliable. The murder took place in a dimly-lit park on a cold and rainy night and Mr.

Williams purportedly saw the fatal beating from 30 to 40 feet away. Mr. Williams considered the

victim a friend and had known her for five years—well enough to use her as a lookout during at

least five crimes—but claimed the only person at the scene he recognized was Mr. Hatchett, who

Mr. Williams admitted he had never spoken with. Mr. Williams also testified that Mr. Hatchett

had yelled obscenities at him during the crime. As the trial transcript reflects, Mr. Hatchett, who

was recovering from a gunshot wound to the neck, as well as the leg, was incapable of screaming at the time of the murder.

99.     For various reasons, including that Mr. Hatchett's defense attorney failed to properly provide the prosecution with notice of alibi witnesses, the court declared a mistrial based on the attorney's ineffective assistance of counsel.

100.    Mr. Hatchett was retried on February 10, 1992, with a new defense attorney.

101.    Similar to the first trial, the sole evidence connecting Mr. Hatchett to the crime was testimony from Jerry Williams, who claimed he saw and heard Mr. Hatchett murdering Neda Mae Carter in the park.

102.    Mr. Hatchett also testified at trial. Due to his learning disabilities, his cognitive limitations, and his physical condition—because of his injuries Mr. Hatchett struggled to speak clearly and audibly at the time of the murder and trial—Mr. Hatchett had great difficulty articulating his testimony. However, he continued to maintain his innocence and truthfully testified to his whereabouts the night of the murder, which was corroborated by the testimony of the friend he was with at the time.

103.    In addition, although Williams himself testified at the first trial to telling officers upon his arrest for burglary that someone other than Hatchett, who was in lockup with him, looked like the murderer, Defendants and the prosecution failed to disclose to Mr. Hatchett's defense attorney at either the first trial or second trial the identity of James Pringle as the perpetrator Williams initially identified, or disclose Jerry Williams's drug use at the time of the murder.

104.    Nor did NYPD Defendants Fergerson, Rice, Henry, Parker, Donawa, Zanatta, or Harsch, ever disclose to the prosecution, or to Mr. Hatchett's defense counsel, the fact that Defendants had used suggestion and inducements to secure Mr. Williams and Ms. Hopkins's identification

of Mr. Hatchett; that they fed Mr. Williams and Ms. Hopkins facts about the crime and Mr. Hatchett, and misrepresented that those facts originated with Williams and Hopkins to make their accounts appear reliable; or the fact that, upon information and belief, Defendants had secured Mr. Williams's cooperation in exchange for not prosecuting his pending burglary charge.

105.    The NYPD Defendants' suppressions and misrepresentations made Williams's testimony appear to be reliable in this specific case, overcoming reasons known to the prosecution and defense to doubt Williams's reliability in general.

106.    Furthermore, Mr. Hatchett's attorney never obtained records documenting the critical information about Mr. Hatchett's medical condition, including the extent of his injuries and physical limitations at the time of the crime.

107.    Lacking all of this critical exculpatory information—significantly the fabrications and suggestion used by NYPD Detectives to secure Williams's statement and identification of Mr. Hatchett, and Mr. Hatchett's disabilities making it impossible for him to have been the perpetrator—the jury found Mr. Hatchett guilty of second degree murder on February 19, 1992.

108.    Mr. Hatchett was sentenced to the maximum possible term of twenty-five years to life.

## EXONERATION

109.    Mr. Hatchett appealed his conviction, but the conviction was affirmed by the Appellate Division on March 11, 1996.

110.    In April of 2015, Mr. Hatchett's case was chosen for review by the Kings County District Attorney's Office Conviction Review Unit (CRU).

111.    From April 2015 to March 2016, CRU, in connection with Mr. Hatchett's post-conviction counsel at the Innocence Project, extensively reviewed the investigation of Neda Mae Carter's homicide. This review unearthed several critical pieces of evidence that were unknown and

unavailable to Mr. Hatchett's defense attorney at the time of trial, and led the Kings County District Attorney's Office to conclude that Mr. Hatchett had been wrongfully convicted. Based on this new evidence, CRU and the Innocence Project filed a joint motion to vacate Mr. Hatchett's conviction.

112.    One of the facts the reinvestigation unearthed was the identity of the man who Jerry Williams identified prior to identifying Andre Hatchett, which was never disclosed to Mr. Hatchett.

113.    The CRU's review also revealed that Jerry Williams initially reported he had been smoking crack on the day of the murder. Williams falsely testified at trial that he had never smoked crack and was not under the influence of any substance when he observed the murder. Given that Jerry Williams provided the only connection between Mr. Hatchett and the homicide, evidence undermining his cognitive abilities and his credibility would have been critical at both the suppression hearing and trial. Kings County ADA Mark Hale informed the court that "the People have no confidence whatsoever in this sole eyewitness or reliability of this sole eyewitness."

114.    The CRU also considered Mr. Hatchett's own medical records, which revealed that Mr. Hatchett was "extremely disabled" at the time of the murder. Given the violent and brutal nature of Ms. Carter's homicide, ADA Hale explained to the court that "It is implausible to the point of saying impossible for a person with Mr. Hatchett's physical limitations to have been able to commit all of these acts which the perpetrator must have committed."

115.    ADA Hale further noted that the NYPD Defendants' investigation was problematic: that police reports that the Defendants generated "referred to one thing" but their notes "reflected something completely different," and that there were incidents that occurred during the

investigation that "were not noted at all—no reports that were made."

116.    Recognizing that Mr. Hatchett was approaching his twenty-fifth year of incarceration for a crime he did not commit, ADA Hale stated: "It is the D.A.'s commitment that he not make that particular anniversary and that he should not spend another minute in jail for this wrongful conviction and this wrongful incarceration." ADA Hale also requested that the indictment against Mr. Hatchett be dismissed.

117.    Justice D'Emic granted the Joint Motion to Vacate under C.P.L. § 440.10(1)(g) and dismissed the indictment the same day, March 10, 2016. Mr. Hatchett was subsequently released from prison, after serving nearly 25 years for a crime he did not commit.

## THE NYPD HAD A POLICY, PRACTICE, OR CUSTOM OF MISCONDUCT IN HOMICIDE INVESTIGATIONS

118.    The City of New York, by and through its final policymakers, had in force and effect in the years prior to the Carter murder investigation and through the investigation and wrongful prosecution of Andre Hatchett, a policy, practice or custom of unconstitutional misconduct in homicide investigations, including in particular the use of plainly unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements and identifications; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.

119.    The investigation of Mr. Hatchett was conducted pursuant to each of these customs of misconduct, which were widespread throughout the NYPD, in particular in the 75th precinct, where Defendants Fergerson and Henry trained, and the 81st precinct.

120.    The NYPD's policy, practice, or custom of extracting false statements from informants

and/or witnesses involved the use of various techniques, including, without limitation: promising

leniency or threatening prosecution in order to induce the informant and/or witness to make a

particular statement, and withholding this information from prosecutors and defense counsel;

feeding the informant and/or witness facts about the crime, or about how the detectives believed

the crime had been committed, and misrepresenting to prosecutors that those facts had originated

with the informant/witness; suggesting to and/or instructing the informant and/or witness to

identify a particular person as the culprit, whether from a line-up, photo array, or in the course of

giving a statement; and seeking to bolster the credibility of an incredible witness by using

coercion and/or suggestion to extract a similar statement from another witness. Police

Defendants used each of these tactics in manufacturing a case against Mr. Hatchett.

121.    Various cases demonstrate that this misconduct was pervasive within the NYPD around

the time of the investigation of Ms. Carter's murder. In particular:

   a.   In 1991, Jeffrey Blake was wrongfully convicted of a 1990 double homicide that

        was investigated by 75th Precinct detectives.  Blake was arrested, prosecuted, and

        convicted based on the testimony of Dana Garner, a clearly unreliable witness

        who purportedly claimed to have witnessed the killings even though he was out of

        the state at the time. Garner since admitted that a Sergeant fed him non-public

        facts about the crime and pressured him into falsely implicating Blake in those

        murders. The same Sergeant was also present at the lineup, during which he and

        another detective pressured Garner to select Blake by verbally encouraging him

        and motioning in Blake's direction.  Jeffrey Blake served nearly eight years in

        prison for the murders before being exonerated, and he subsequently settled a

civil rights suit against the City.

b.   Also in 1990, while the informant Dana Garner was at the 75th Precinct falsely
implicating Jeffrey Blake in the double homicide, detectives began to question
him about a different murder that had happened a few days earlier.  Though
Garner initially told the Sergeant that he did not know who committed the murder,
the Sergeant fed him nonpublic facts about the crime and ultimately pressured
him into implicating Ruben Ortega as the shooter. As in Blake's case, the
informant was pressured into identifying Ortega from a photo array and then from
a lineup. Due to the 75th Precinct's rampant use of illegal investigatory
techniques, Ortega also served many years in prison based on false testimony
from a clearly unreliable informant.

c.   Incredibly, Dana Garner had already falsely accused a different man, Timothy
Crosby, of his 1988 kidnapping.  Consistent with its practice of conducting
inadequate investigations, the 75th Precinct investigated this crime and arrested
Crosby based principally on Garner's word.  After the Blake and Ortega
misconduct came to light, Garner admitted that he falsely implicated Crosby, and
Crosby's conviction was vacated after he had spent nearly twelve years in prison
for a crime he did not commit.

d.   In 1989, Bernie Pollard was wrongly arrested, imprisoned, and charged with a
murder he did not commit—a crime investigated by 75th Precinct detectives.
Pollard had been arrested previously and was known to the police at the time of
the crime. He was implicated by two jailhouse snitches who later tried to recant,
but were threatened with perjury if they went back on their false statements about

Pollard. An NYPD detective pressured another witness to select Pollard from a lineup, and the detectives failed to even question an obvious suspect, the victim's partner with whom she had been feuding. Pollard spent fifteen months imprisoned at Rikers Island before the charges were dropped.

e. In 1992, Reginald Connor and Everton Wagstaffe were wrongly arrested, imprisoned, and charged with a murder-kidnapping they did not commit, a crime investigated by 75th Precinct detectives. The only direct evidence against them was the false and unreliable testimony of a local prostitute and heroin addict, which was procured through misconduct by the 75th precinct detectives who misrepresented that Mr. Connor's name originated with her, when in fact it was supplied to her by police, and because information about the crime had also been supplied to her by police. Connor and Wagstaffe were not exonerated until nearly 23 years later.

f. In 1990, Jonathan Fleming was convicted of a Brooklyn murder based on the testimony of a single admitted crack addict. The purported witness incredibly testified that she could view Fleming commit the crime from a significant distance. The witness later recanted, saying that NYPD officers had threatened her with jail time if she did not implicate Fleming. Fleming was arrested and prosecuted, though the NYPD was aware of significant evidence proving that he had actually been in Florida at the time of the crime. He spent 24 years in prison for a crime he did not commit before being exonerated in 2014.

g. William Lopez was wrongfully convicted of a 1989 murder that happened in the basement of a Brooklyn crack house. Investigators ignored significant evidence

27

of Lopez's innocence that pointed to the true perpetrator. Most notably, the shooter was described as man taller than six feet, three inches, with black skin; Lopez is light-skinned and five foot, seven inches tall. Lopez was convicted of the murder based on the false testimony of a crack addict and prostitute. The witness was pressured into telling the police that Lopez was the shooter, and she had falsely selected Lopez's picture from a photo array. The NYPD suppressed the fact that the witness, who had been arrested on a prostitution charge, was promised leniency in exchange for implicating Lopez. The witness has since recanted, and Lopez was released after spending 23 years in prison for a crime he did not commit.

h. Derrick Deacon was arrested in 1989 and ultimately convicted of a Brooklyn murder that he did not commit. NYPD officers ignored evidence pointing to Deacon's innocence, including that he did not match the description of the perpetrator, and they instead pressured a witness into implicating Deacon in the crime. Though the witness did not wish to implicate Deacon, the police threatened her with the potential loss of custody over her children if she failed to cooperate with their false story of the crime. After his conviction was vacated, Deacon was retried but acquitted after just nine minutes of jury deliberation. He spent twenty-four years wrongfully imprisoned.

i. Jabbar Collins was convicted of murdering a rabbi during a Brooklyn robbery in 1994. Three witnesses testified against him, one of whom was severely drug addicted. Though the prosecutor denied that they had been offered anything for their testimony, at least one witness testified that he was threatened with violence

and incarceration if he did not implicate Collins. Collins spent fifteen years in prison for a crime he did not commit, and he recently settled a civil suit with the city for 10 million dollars.

j.   Sharrif Wilson and Antonio Yarbough were arrested and convicted of the June 18, 1992 triple murders of Mr. Yarbough's relatives. Although both were innocent, 15-year-old Wilson and 17-year-old Yarbough adopted false confessions after being separately interrogated and coerced by detectives, who lied to prosecutors and again at trial about the illegal tactics they had used to obtain the confessions. The detectives' misconduct included feeding Wilson and Yarbough facts about the way detectives believed the crimes had been committed, and misrepresenting that those facts had originated with Wilson and Yarbough. Detectives also failed to investigate exculpatory information, including leads pointing to another individual. Wilson and Yarbough spent over twenty years in prison before DNA testing proved their innocence and the King's County District Attorney's Office joined a motion to vacate their convictions, which was granted.

122.   These examples also show that at that time of the Carter investigation and earlier, the City had a custom, policy, or practice of failing to properly supervise, train, and discipline its officers and maintaining grossly inadequate mechanisms for identifying, monitoring, and disciplining police corruption and misconduct. After an exhaustive investigation, the Mollen Commission concluded that "police supervision was in a state of crisis" and that "[t]he Department's management [was] largely to blame for this state of supervision." Mollen Rep. at 79, 82. This lack of supervision allowed misconduct and corruption like the falsification of evidence and falsification of records by police to flourish. The Commission lamented that, "what

is particularly troublesome about [police falsifications] is that it is widely tolerated by . . .

officers [and] their supervisors." *Id*. at 40.  The NYPD's system of supervision and fighting

corruption had "virtually collapsed years ago" and "was more likely to minimize or conceal

corruption than uncover and uproot it" due to "a deep-seated institutional reluctance to uncover

serious corruption." *Id*. at 70, 71.

123.     Around the time of the Carter murder investigation, similar misconduct led to the

wrongful convictions of additional individuals, including: Derrick Hamilton, Rosean Hargrave,

John Dwayne Bunn, Carlos Davis, Charles Shepherd, and Anthony Faison.

**DAMAGES**

124.     The unlawful actions of Defendants caused Andre Hatchett to spend almost twenty-five

years—more than half of his life—in prison for a brutal murder he did not commit.

125.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or

deliberately indifferent acts and omissions, Andre Hatchett sustained injuries and damages,

including but not limited to the loss of freedom for nearly twenty-five years; loss of his youth;

pain and suffering; physical injuries, including injuries from physical altercations with guards

and other inmates, the worsening of injuries and health conditions due to inadequate medical

care; severe mental anguish; emotional distress; loss of family relationships; loss of income;

severe psychological damage; humiliation, indignities and embarrassment; degradation;

permanent loss of natural psychological development; and restrictions on all forms of personal

freedom including but not limited to diet, sleep, personal contact, educational opportunity,

vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression.

126.     Tragically, Andre Hatchett's younger son, both of his parents, two close aunts, and his

younger brother passed away while he was in prison. His wrongful conviction caused him to miss much of his remaining children's childhoods.

127.    Mr. Hatchett's cognitive limitations made understanding and coping with his wrongful conviction particularly difficult.

128.    All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

129.    As a direct result of his unjust conviction and imprisonment, many of the foregoing effects of these damages continue to this day and will continue into the future.

## FEDERAL CLAIMS

### COUNT I
**42 U.S.C. § 1983 Fifth and Fourteenth Amendment Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Using Unduly Suggestive Identification Procedures, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

130.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

131.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, acting individually and/or in concert, as well as under color of state law and within the scope of their employment, deprived Plaintiff Andre Hatchett of his clearly established constitutional right of due process and a fair trial.

### *A. Fabrication of Evidence*

132.    In the manner described more fully above, Defendants deprived Plaintiff Hatchett of his constitutional rights by deliberately fabricating inculpatory evidence against Mr. Hatchett,

31

including without limitation by fabricating witness statements from Jerry Williams and Yvette Hopkins, and fabricating Jerry Williams's and Yvette Hopkins's false identifications of Andre Hatchett, thereby depriving Mr. Hatchett of his right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, not to be deprived of liberty without due process of law, and to a fair trial. These fabrications were each used against Andre Hatchett to cause his arrest, pre-trial incarceration, prosecution, conviction, and wrongful incarceration.

133. Specifically, and without limitation, Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, and Harsch fabricated and/or coerced a false witness statement from Jerry Williams in which they fed Jerry Williams facts about the Carter homicide they believed to be true as described above. For example, Defendants Fergerson, Donawa, Parker, Henry, Zanatta, and Harsch fed Williams facts that:

     a.  Neda Mae Carter had been bludgeoned by an instrument, believed to be a pipe;

     b.  that the perpetrator, who Defendants unreasonably and wrongly believed to be Andre Hatchett, had been shot the year before the murder;

     c.  that the perpetrator, who Defendants unreasonably and wrongly believed to be Andre Hatchett, had been walking on crutches;

     d.  that the perpetrator, who Defendants unreasonably and wrongly believed to be Andre Hatchett, spoke with a raspy voice

     e.  that the perpetrator, who Defendants unreasonably and wrongly believed to be Andre Hatchett, was about 5'6" and had a full beard and thin moustache.

134. Defendants Fergerson, Rice, and Donawa also fabricated and/or coerced a false witness statement from Yvette Hopkins, in which they fed Ms. Hopkins facts about the Carter homicide and Williams's statement in order to corroborate Williams's account.

135.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, and Harsch misrepresented in police reports and/or in pre-arrest and pre-trial communications with prosecutors that Jerry Williams and Yvette Hopkins spontaneously and voluntarily provided details in their statements that matched the facts of the crime and Defendants' belief that the perpetrator was Andre Hatchett, in order to make their statements appear reliable and corroborate one another, when in fact they knew they were not.

136.    Defendants furthermore deprived Andre Hatchett of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate, and/or in the alternative suppressing the results of investigation, witnesses and evidence which would have supported Andre Hatchett's innocence as described further above.

137.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have believed this conduct was lawful.

138.    As a direct and proximate result of Defendants' actions Andre Hatchett was indicted, tried, wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

### B. Unduly Suggestive Identification Procedures

139.    Defendants Fergerson, Rice, and Donawa fabricated and/or coerced Jerry Williams to falsely identify Andre Hatchett, using improper methods such as showing Andre Hatchett's mugshot to Jerry Williams prior to a live lineup, and using suggestion during the lineup to obtain Williams's identification.

140.    In addition, Defendants Fergerson, Rice, and Donawa fabricated and/or coerced Yvette Hopkins to falsely identify Andre Hatchett, using improper suggestion before and during the lineup to obtain Hopkins's identification.

141.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have believed this conduct was lawful.

142.    As a direct and proximate result of Defendants' actions Andre Hatchett was indicted, tried, wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

### C. Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution

143.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, and Harsch, and Does #1–10, suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation: that the interrogating Defendants fed Jerry Williams and Yvette Hopkins details about the crime they believed to be true and then misrepresented that those facts originated with Jerry Williams and Yvette Hopkins; and failed to disclose the suggestion and improper conduct leading to Jerry Williams's and Yvette Hopkins's identifications of Andre Hatchett.

144.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Andre Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have believed this conduct was lawful.

145.    As a direct and proximate result of Defendants' actions Andre Hatchett was indicted,

tried, wrongly convicted and imprisoned for almost twenty-five years and suffered the other

grievous damages and injuries set forth above.

**COUNT II**

**42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution**

146.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

147.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10,

with malice and knowing that probable cause did not exist to arrest Andre Hatchett and prosecute

him for the murder of Neda Mae Carter, acting individually and in concert, caused Andre

Hatchett to be arrested, charged, and prosecuted for that crime, thereby violating Andre

Hatchett's clearly established right, under the Fourth and Fourteenth Amendments of the United

States Constitution, to be free of unreasonable searches and seizures.

148.    Specifically, Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and

Does #1–10, with malice, knew or in the absence of their deliberate and reckless indifference to

the truth should have known, that probable cause did not exist to arrest and prosecute Andre

Hatchett, including but not limited to the facts that Jerry Williams and Yvette Hopkins's

statements and identification of Andre Hatchett were fabricated by the Defendants and the

product of improper and unduly suggestive identification procedures, and wholly unreliable, and

that those factors as well as additional material exculpatory and impeachment evidence which

Defendants did not disclose undermined the evidence presented in support of a probable cause

finding against Andre Hatchett.

149.    In addition, the Defendant officers, with malice, acting individually and in concert,

intentionally and knowingly, deliberately misrepresented the truth and withheld exculpatory facts

from prosecutors and the grand jury that vitiated probable cause against Andre Hatchett, including but not limited to their having fed Jerry Williams facts they believed to be true about the crime and their having manipulated him into adopting those facts in his statement, and that they used unduly suggestive and improper identification procedures to obtain Jerry Williams's identification of Andre Hatchett including showing Williams a mugshot of Hatchett prior to the lineup procedure; and their having fed facts to Yvette Hopkins and manipulated her to adopting those facts in a statement to corroborate Williams's statement, and then misrepresenting that those facts originated with Ms. Hopkins; and using unduly suggestive and improper identification procedures to obtain Ms. Hopkins's identification of Andre Hatchett.

150.     The Defendants performed the above-described acts under color of state law, deliberately, intentionally, with reckless disregard or deliberate indifference to the truth and Andre Hatchett's rights, and with malice.

151.     Defendants initiated and continued the prosecution against Andre Hatchett without probable cause, in violation of Andre Hatchett's clearly established constitutional rights. No reasonable officer in 1991 would have believed this conduct was lawful.

152.     Andre Hatchett is innocent of the Carter murder.

153.     The prosecution finally terminated in Mr. Hatchett's favor on March 10, 2016, when his conviction was vacated and the indictment against him dismissed.

154.     As a direct and proximate result of Defendants' conduct, Andre Hatchett was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

**Count III**

**42  U.S.C. § 1983 Civil Rights Conspiracy**

155.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

156.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, acting within the scope of their employment and under color of state law, agreed among themselves and with others, including Jerry Williams, to act in concert in order to deprive Andre Hatchett of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency.

157.    In furtherance of the conspiracy each Defendant engaged in and facilitated numerous overt acts described above.

158.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Andre Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have believed this conduct was lawful.

159.    As a direct and proximate result of Defendants' actions Andre Hatchett was wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

**COUNT IV**

**42 U.S.C. § 1983 Failure to Intercede**

160.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

161.    By their conduct and under color of law, the Defendant officers, Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, had opportunities to intercede on behalf of Andre Hatchett to prevent Andre Hatchett's his malicious prosecution, and the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

162.    The Defendant officers' failures to intercede violated Andre Hatchett's clearly established constitutional rights, including but not limited to his right not to be deprived of liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments.

163.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Andre Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have believed this conduct was lawful.

164.    As a direct and proximate result of Defendants' actions Andre Hatchett was indicted, tried, wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

### COUNT V
### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Failure to Investigate Available Exculpatory Evidence, under *Russo v. City of Bridgeport*

165.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

166.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, acting individually and in concert, ignored the facts in front of them and failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Andre Hatchett's prosecution.

167. The deliberate and reckless investigative failures of the Defendants included, but were not limited to: failing to investigate the individuals who would corroborate Andre Hatchett's whereabouts on the night of the murder; failing to investigate and/or investigating but burying the fact Mr. Hatchett's physical impairments prevented him from committing such a powerful crime; failing to investigate exculpatory and potentially exculpatory medical and forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence.

168. Upon information and belief, if the Defendants had conducted a minimally adequate investigation by speaking with Mr. Hatchett's alibi witnesses, investigating the inconsistent statements provided by Williams and Hopkins, sought out the acquaintances Neda Mae Carter saw in the hours before her murder, or investigated Mr. Hatchett's disabilities, they would have discovered that Mr. Hatchett did not, and could not, have committed the crime.

169. Andre Hatchett is completely innocent of the Carter murder.

170. Despite his innocence and the absence of probable cause to prosecute him, Andre Hatchett was held from his arrest on March 26, 1991 until the prosecution against him finally terminated in his favor on March 10, 2016, when his conviction was vacated and the indictment against him dismissed.

171. The Defendants' deliberate and reckless failure to investigate deprived Andre Hatchett of his clearly established constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution, including but not limited to his right not be subject to unreasonable seizures.

172. The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly, with malice, and with deliberate indifference or reckless disregard for Andre Hatchett's constitutional rights and innocence. No reasonable officer in 1991 would have

believed this conduct was lawful.

173.     As a direct and proximate result of Defendants' conduct, Andre Hatchett was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

**COUNT VI**

**42 U.S.C. § 1983 Claim for Violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act Against the City of New York and the Individual Defendants**

174.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further allege as follows:

175.     Plaintiff suffers from one or more disabilities—including, without limitation, mental illness and limited cognitive functioning—that substantially limit one or more of his major life activities, including without limitation: caring for himself, thinking, working, communicating, learning, and sleeping. In addition, Plaintiff is regarded as suffering from one or more qualifying disabilities.

176.     The individual Defendants interrogated Jerry Williams and Yvette Hopkins, and administered identification procedures to Williams and Hopkins, and interrogated Andre Hatchett and conducted the unlawfully flawed investigation, arresting Mr. Hatchett all while employed by the New York City Police Department, a subdivision of the City of New York. Arrests and investigations are services, programs, or activities of a city's police department that are covered by the Americans with Disabilities Act.

177.     Upon information and belief, Defendant City of New York is the recipient of federal funds as defined by the Rehabilitation Act, and was receiving federal funds during the relevant time period covered by this Complaint.

178. With knowledge of Mr. Hatchett's serious mental disabilities and/or regarding Mr. Hatchett as seriously disabled, the individual Defendants discriminated against him by reason of that disability. The City by and through its agents intentionally, or with deliberate indifference, exploited Mr. Hatchett's mental illness by, among other things, failing to investigate his alibi and other evidence of his innocence, and conducting and relying exclusively on suggestive identification procedures. Defendants engaged in misconduct in whole or in part because they thought they could get away with that misconduct as a result of Mr. Hatchett's disabilities.

179. As a direct and proximate result of the individual Defendants and Defendant City of New York's actions, Mr. Hatchett was wrongly prosecuted, detained, and incarcerated for twenty-five years and suffered the other grievous injuries and damages set forth above.

## COUNT VII

### 42 U.S.C. § 1983 Supervisory Liability

180. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

181. The individual defendant police officers and/or detectives, Fergerson, Rice, Donawa, Parker, Henry, Zanatta, and Harsch, and Does, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Does who were supervisors, in this case and as a matter of practice.

182. Defendant Does, including Does #1 and #2, and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers and detectives and thereby caused the individual defendant police officers and detectives to deprive Andre Hatchett of his clearly established constitutional rights, including his rights to be

free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

183. Had Defendant Does and other supervisors not provided grossly inadequate training, supervision, and discipline of defendant officers and detectives, those defendants would not have used unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications of Andre Hatchett; fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Andre Hatchett to be arrested and prosecuted without probable cause. Defendant Does and other supervisors were directly involved in the investigation of Andre Hatchett and directly supervised the investigative acts taken by the individual officer and detective defendants in this case.

184. The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendant Does and other supervisors under color of state law violated their clearly established constitutional duty, in 1991, to supervise defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch and Does, and no reasonable police supervisor in 1991 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

185. As a direct and proximate result of Defendants' actions, Andre Hatchett was wrongly convicted and imprisoned for nearly 25 years and suffered the other grievous and continuing damages and injuries set forth above.

<u>**COUNT VIII**</u>

**42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy, or Pattern and Practice of Promoting, Facilitating, or Condoning Illegal, Unconstitutional Investigative Techniques, and Failure to Supervise, Discipline, and Train Against Defendant City of New York.**

186.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

187.     Prior to and at the time of the unlawful investigation, prosecution, and conviction of Andre Hatchett, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques in serious felony investigations, including but not limited to the following: (a) the use of unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; (b) the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false statements and false identifications; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (e) the intentional failure to conduct adequate investigations of crimes; and (f) engaging in the affirmative concealment and cover up of this type of misconduct.

188.     Prior to and at the time of the unlawful investigation, prosecution, and conviction of Andre Hatchett, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to using police informants/witnesses, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to

43

come forward with exonerating evidence.

189.    The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing adequately supervise, discipline and train NYPD detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple NYPD detectives in relation to multiple witnesses in the Neda Mae Carter investigation, as described above, as well as by other incidents and the findings of the Mollen Commission identified in paragraphs 121 to 123, above.

190.    The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected in numerous prior cases and investigations which, upon information and belief, were known to the NYPD supervisors and policymakers prior to and during the Carter investigation.  The misconduct committed in those cases was actually or constructively known to NYPD supervisors and policymakers prior to and during the Carter investigation, and, upon information and belief, NYPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate detectives and officers in response to such notice or make any meaningful investigation into the above practices and techniques. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Andre Hatchett.

191.    The foregoing customs, policies, practices, procedures of the City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiff Andre Hatchett.

192.    The foregoing customs, policies, practices, procedures of the City of New York and the

NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff Andre Hatchett as alleged herein.

193.    The foregoing customs, policies, practices, procedures of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by Plaintiff Andre Hatchett as alleged herein.

194.    Such unconstitutional municipal customs, practices and/or policies caused Andre Hatchett's arrest, prosecution, and nearly twenty-five years of incarceration, as well as all the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

## <u>COUNT IX</u>

### Malicious Prosecution

195.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

196.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, intentionally, recklessly, and with malice, and despite knowing that probable cause did not exist to arrest and prosecute Andre Hatchett for the murder of Neda Mae carter, acting individually and in concert, caused Andre Hatchett to be arrested, charged, prosecuted, and convicted for the Carter murder.

197.    Specifically, Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Andre Hatchett, including but not limited to the facts that Jerry Williams and Yvette Hopkins's statements and identification of Andre Hatchett were fabricated by the Defendants and the

product of improper and unduly suggestive identification procedures, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence which Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Andre Hatchett.

198.     In addition, the Defendant officers, with malice, acting individually and in concert, intentionally and knowingly, deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Andre Hatchett, including but not limited to their having fed Jerry Williams facts they believed to be true about the crime and their having manipulated him into adopting those facts in his statement, and that they used unduly suggestive and improper identification procedures to obtain Jerry Williams's identification of Andre Hatchett including showing Williams a mugshot of Hatchett prior to the lineup procedure; and their having fed facts to Yvette Hopkins and manipulated her to adopting those facts in a statement to corroborate Williams's statement, and then misrepresenting that those facts originated with Ms. Hopkins; and using unduly suggestive and improper identification procedures to obtain Ms. Hopkins's identification of Andre Hatchett.

199.     Andre Hatchett is innocent of the murder of Neda Mae Carter. Mr. Hatchett's cause of action for malicious prosecution was unavailable to him until his prosecution finally terminated in his favor on March 10, 2016, when his conviction was vacated and the charges against him were dismissed.

200.     Defendants engaged in these acts within the scope of their employment.

201.     As a direct and proximate result of Defendants' actions, Andre Hatchett was wrongly convicted and imprisoned for almost twenty-five years and suffered the other grievous damages and injuries set forth above.

## COUNT X

### Intentional, Reckless or Negligent Infliction of Emotional Distress

202.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

203.     The improper, deliberate, and traumatizing conduct of Defendants Fergerson, Rice,

Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, during the investigation of Andre

Hatchett, as well as their conduct in deliberately causing, or recklessly disregarding the risk of

causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional

distress, was extreme and outrageous, and directly and proximately caused the grievous injuries

and damages set forth above.

204.     In the alternative, Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch,

and Does #1–10, negligently and grossly negligently, and in breach of their duties owed to Andre

Hatchett to, *inter alia*, report accurately the information given by witnesses and the

circumstances underlying such statements; refrain from conducting unduly suggestive

identification procedures and report accurately what occurred during identification procedures;

refrain from fabricating evidence and withholding material exculpatory and impeachment

evidence, and otherwise acting to deny Andre Hatchett due process of law, directly and

proximately caused Mr. Hatchett, who was innocent, to be falsely arrested, maliciously

prosecuted, and wrongly imprisoned for more than two decades. Defendants' actions

unreasonably endangered Andre Hatchett's physical and mental health and safety, and caused

him to suffer physical harm, including physical ailments resulting from the circumstances and

duration of his wrongful incarceration, and to fear for his physical safety throughout the period

of his pretrial and post-conviction incarceration.

205.    Defendants engaged in these acts within the scope of their employment.

206.    These claims are tolled as Defendants concealed from Andre Hatchett—and still are concealing to this day—their conduct giving rise to this cause of action.

## COUNT XI

### Negligence

207.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

208.    Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does #1–10, are liable for negligence, having breached their duty of reasonable care to Andre Hatchett.

209.    Specifically, and by way of example, Defendants:

    a.    failed to report accurately the circumstances of the interrogations of Jerry Williams and Yvette Hopkins, including information they provided to Williams and Hopkins but misrepresented as originating with Williams and Hopkins;

    b.    used improper suggestion to obtain identifications of Mr. Hatchett by Williams and Hopkins, and failed to accurately report and in fact misrepresented the circumstances of those identifications;

    c.    failed to properly investigate leads and information that would have shown Andre Hatchett's innocence.

210.    Defendants' negligence and gross negligence directly and proximately caused Andre Hatchett to be wrongly prosecuted and imprisoned for more than two decades.

211.    Defendants engaged in these acts within the scope of their employment.

212.    Andre Hatchett is innocent of the murder of Neda Mae Carter. Andre Hatchett's cause of

action for negligence was unavailable to him until his prosecution finally terminated in his favor on March 10, 2016, when his conviction was vacated and the charges against him were dismissed. Furthermore, this claim is tolled as Defendants concealed from Andre Hatchett—and still are concealing to this day—their conduct giving rise to this cause of action.

## COUNT XII

### Supervisory Negligence

213.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

214.     Defendant Doe Supervisors were grossly negligent and negligent in the training, supervision, and discipline of Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does.

215.     Defendant Doe Supervisors knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does, engaged in investigative misconduct including fabricating evidence, conducting unduly suggestive identification procedures, and failing to document and disclose material, exculpatory and impeachment evidence, and that they thereby caused Mr. Hatchett to be maliciously prosecuted and arrested.

216.     As a direct and proximate result of the gross negligence and negligence of Defendant Doe Supervisors, Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch, and Does engaged in the previously set forth misconduct and caused the above-described acts of malicious prosecution, violation of due process, intentional and/or reckless infliction of emotional distress, and negligent infliction of emotional distress, thereby directly and proximately causing Mr. Hatchett's wrongful conviction and nearly 25 years of wrongful imprisonment, as well as the

other grievous and continuing injuries and damages set forth above.

## COUNT XIII

### New York State Constitution

217.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

218.    The conduct of Defendants Fergerson, Rice, Donawa, Parker, Henry, Zanatta, Harsch,

and Does #1–10, described above, also violated Mr. Hatchett's rights under the New York State

Constitution, including Article I, Sections 6 and 12, to due process of law and to be free from

unreasonable searches and seizures.

219.    Andre Hatchett is completely innocent of the murder of Neda Mae Carter. The

prosecution terminated in his favor on March 10, 2016, when his conviction was vacated and the

indictment dismissed.

220.    As a direct and proximate result of Defendants' actions, Mr. Hatchett was wrongly

imprisoned for nearly 25 years and suffered the other grievous and continuing damages and

injuries set forth above.

221.    Defendant City of New York is liable under respondeat superior for the actions of its

employees within the scope of their employment.

## COUNT XIV

### *Respondeat Superior* Claim Against the City of New York

222.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

allege as follows:

223.     At all times relevant to this Complaint, Defendants Fergerson, Rice, Donawa, Parker,

Henry, Zanatta, and Harsch, acted as agents of the City of New York, in furtherance of the

business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with City of New York.

224.    The conduct by which the Defendant officers committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendant officers' personal motives, but rather was undertaken while the Defendant officers were on duty, carrying out their routine investigative functions as detectives and police officers.

225.    Under the doctrine of *respondeat superior*, the City of New York is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

        **WHEREFORE**, Plaintiff Andre Hatchett prays as follows:

A.      That the Court award compensatory damages to Plaintiff and against the Defendants, jointly and severally, in an amount to be determined at trial;

B.      That the Court award punitive damages to Plaintiff, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.      For a trial by jury;

D.      For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.      For any and all other relief to which the Plaintiff may be entitled.

Dated:     New York, New York
           March 8, 2017

                                        /s/ Emma Freudenberger
                                        Nick Brustin
                                        Emma Freudenberger
                                        Alexandra Lampert
                                        Amelia Green
                                        NEUFELD SCHECK & BRUSTIN, LLP
                                        99 Hudson Street, 8th Floor
                                        New York, New York 10013
                                        (212) 965-9081
                                        **Attorneys for Plaintiff Andre Hatchett**